UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SHARON TREVINO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-0889-B |
| | § | |
| UNITED PARCEL SERVICE and | § | |
| RONNIE WEIGANT, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion of Defendant United Parcel Service for Summary Judgment

on all of Plaintiff Sharon Trevino's claims (doc. 57). Trevino asserts multiple causes of action against

Defendant United Parcel Service ("UPS") arising of out his employment relationship with UPS,

including, discrimination, harassment, and failure to accommodate in violation of the Americans

With Disabilities Act ("ADA"); discrimination and harassment on the basis of sex, and retaliation

in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); retaliation under the Family

Medical Leave Act ("FMLA"); and violations of the Employee Retirement Income Security Act

("ERISA"). For the reasons stated in this order, the Court GRANTS UPS's Motion in part and

DENIES it in part.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

---

[1] Plaintiff also asserts claims against Defendant Ronnie Weigant that are the subject of a separate Motion for Summary Judgment (doc. 53). This Memorandum Opinion recites only those facts relevant to the consideration of the claims against Defendant UPS and UPS's Motion (doc. 41; doc. 57).

Defendant UPS is a worldwide package delivery company that operates a distribution hub in Mesquite, Texas.  Plaintiff Sharon Trevino is a "feeder driver" based in the Mesquite hub.  In this capacity, she operates tractor-trailer rigs, often at great distances, between UPS hubs and between UPS facilities and customers.  (Pl. App. p. 2; Def. App. p. 176).  The tractor-trailer rigs operated by feeder drivers are commercial motor vehicles ("CMVs") regulated by the United States Department of Transportation ("DOT").   (Def. App. p. 176).

Trevino joined UPS in Dallas in 1984 as a car washer and was subsequently promoted to fueler and package car driver before becoming a feeder driver at the Mesquite hub in 1999.  (doc 41, p. 3; Def. App. p. 176).  She was one of the first female feeder truck drivers at the Mesquite hub. (Pl. App. p. 79).

The Mesquite hub is managed by Division Manager Mark Lopes.  Benjamin Mezechenko, UPS's Transportation Service Manager, oversees feeder operations there.  (Def. App. p. 176).  Each feeder driver is assigned to one of seven "On-Road Supervisors," who report to Mezechenko and manage a group of approximately 40 feeder drivers.  (Pl. App. p. 66-67).  On-Road Supervisors have managerial responsibility for those feeder drivers assigned to their groups, and supervisory authority, including authority to counsel and issue warning letters, over all of the more than 475 feeder drivers based at the Mesquite hub.  (Def. App. p. 221).   At the time relevant to Trevino's claims, she was assigned either to On-Road Supervisor Jake Valenzuela or Brad Nelson.  (*Id.*).  Ronnie Weigant, also a defendant in this suit, is an On-Road Supervisor.[2]

---

[2]  Additional factual background regarding Ronnie Weigant is included in this Court's order of October 5, 2009 (doc. 82).  Trevino sued Weigant in his individual capacity as well; the facts involving Weigant that also bear on Trevino's claims against UPS are repeated here.

Trevino's employment is governed by a collective bargaining agreement ("CBA") negotiated between UPS and Local 767 of the International Brotherhood of Teamsters ("Union"). (Def. App. p. 184-185). The CBA includes a multi-level grievance procedure that allows employees, with union representation, to challenge decisions affecting their employment. (*Id.*). Employees retain their employment and benefits during the pendency of the grievance process. (*Id.*). Trevino successfully grieved each of her terminations and, after receiving medical approval to resume driving, was reinstated to her prior position as a feeder driver in the Mesquite hub, a position she continues to hold today. (Def. App. p. 178).

A. *Trevino's Medical Conditions and FMLA Leave*

Trevino has been diagnosed with depression, panic disorder, anxiety and post-traumatic stress disorder ("PTSD"); she is under ongoing medical treatment for these conditions. (Pl. App. p. 100-117). She alleges that her medical conditions developed as a result of an incident involving two male UPS supervisors in 2000. (Pl. App. p. 45-62). According to Trevino, two male supervisors confined her in an office, blocking the door as they yelled and reprimanded her. (doc. 64-5 at p. 2). UPS disputes Trevino's account of the incident and her conclusion that the incident caused her medical conditions. (doc. 54 p. 3).

These medical conditions form the basis for Trevino's claims under the ADA. Trevino contends that her impairments limit the major life activities of "sleeping, bathing, caring for herself, working, and memory." (doc. 64 p. 3). While Trevino cannot pinpoint how each of her diagnoses individually affects her, she testified that she has been "confined to her home for a period of multiple weeks" as a result of her depression and PTSD. *Id.*; (Def. App. p. 93). When the symptoms are acute, Trevino contends that she is unable to sleep for days and that she cannot care for herself for

weeks at a time.  (Def. App. p. 102, 112).  She testified that as a result of her panic disorder, she suffers periodic panic attacks, which impair her breathing and completely incapacitate her for periods ranging from approximately thirty minutes to up to one hour.  (Def. App. p. 115).  Trevino also contends that her impairments, when active, preclude her from performing any job. (Pl. App. p. 55).

UPS does not dispute Trevino's diagnoses or that she is at times impaired.  Rather, UPS argues that Trevino's impairments do not establish that she is disabled under the ADA.  (doc. 58 p. 15-19).  UPS argues that Trevino's impairments are "situational" and episodic, causing only temporary or sporadic impairment.  (*Id.*).  UPS does not cite to medical evidence, but points to Trevino's testimony regarding the frequency and severity of her symptoms.  (*Id.*).

As a consequence of her health conditions, Trevino has requested, and UPS has approved, leave under the FMLA on at least nine separate occasions since November 2000.  (Def. App. p. 47-69; Pl. App. p. 19-40).  Both parties agree that the authority to approve requests for FMLA rests with District Occupational Halth Manager Thelma Lee.  (Def. App. p. 140-41; Def. App. p. 29).

In July 2005, Trevino alleges that she was called into a meeting by Division Manager Mike Kelly in which she discussed a variety of issues, including her panic attacks and medical diagnoses, her working conditions, and to which On-Road Supervisor she would report.  (Pl. App. p. 75-77).  Trevino testified that the 2005 meeting also included Employee Relations Manager Etta Gray and Safety Manager Claude Rigsby.  (*Id.*).  She  testified that the Mr. Kelly agreed that Brad Nelson would continue to act as Trevino's On-Road Supervisor.  Trevino further contends that she was told that she could also deal with On-Road Supervisors Art Sanchez and Jake Valenzuela, but that she would not be required to have contact with other supervisors.  (doc. 68-2, p. 11-12).  As a result of the decisions made at the meeting, Trevino alleges that the other On-Road Supervisors, including

-4-

Weigant were instructed not to contact her. *Id.* Weigant denies that he had any knowledge of a July 2005 meeting, that he was ever instructed by management not to contact Trevino, or that he was ever apprised of her medical conditions. (Pl. App. p. 75). UPS contests Trevino's account of the 2005 meeting and denies that it agreed to limit Trevino's contact with any supervisors. (Def. App. p. 257). UPS does not deny that it was aware of Trevino's diagnoses and treatment, or that it approved FMLA leave for those conditions.

B.    *Alleged Discriminatory or Retaliatory Actions*

Trevino describes a series of events since the 2005 meeting that she contends together support her claims of discrimination, harassment or retaliation under the ADA, Title VII and the FMLA.

Chronologically, these events begin with Trevino's application for FMLA leave on July 4, 2006.   Her application for FMLA leave was not approved until August 22, 2006, though the eventual approval was retroactive to July 4.   Trevino argues that the delay of nearly two months in approving her leave evidences harassment and discrimination.   She alleges that Thelma Lee, who had responsibility for approving FMLA requests at the Mesquite hub, held up her paperwork at the request of Earl Greenstreet, who preceded Mezechenko as Transportation Services Manager.   (Def. App. p. 74).   UPS contends the delay was instead the result of Lee's own serious medical condition. Lee testified that she had a motorcycle accident on June 28, 2006 and could not return to work until July 24, 2006.   (Def. App. p. 207-209, 211-212).   Shortly after her return, Lee testified that On-Road Supervisor Brad Nelson followed up about Trevino's FMLA request, which she had not yet seen. *Id.* Lee testified that Trevino's request had been "inadvertently lost in UPS's in-house mail system," but was found and delivered to her on August 18, 2006.   (*Id.*).   Upon receipt, Lee processed

Trevino's request, and on August 23, 2006, she mailed a letter to Trevino approving her request, retroactive to July 4, 2006.  (*Id.*).

Next, Trevino points to an incident in April 2007, when On-Road Supervisor Weigant spoke with her after observing what he believed to be her violation of UPS safety procedures at a loading door.  Weigant testified that he observed Trevino "pull away from a loading door while a part-time loader was still in the trailer," and that he thought the situation was unsafe.  (Doc. 55 p.  2; Def. App. p. 31).  Weigant immediately stopped Trevino and spoke with her about what he perceived to be a safety violation and instructed her on company safety procedures, which include checking the trailer prior to pulling away from the loading door.  (*Id.*).  Trevino filed a grievance, maintaining that she had in fact followed the company safety procedures, but the part-time loader entered her trailer after she checked it.  (*Id.*).  The incident did not result in any suspension or termination, and the grievance subsequently settled.  (Def. App. p. 186).

Trevino next alleges that an incident on December 3, 2007, when Weigant  attempted to hold a disciplinary hearing with her, constituted harassment and discrimination.  The incident concluded with Trevino being taken to the hospital by ambulance.  Weigant testified that Trevino's On-Road Supervisor at the time, Jake Valenzuela (who was leaving for a vacation), had asked him to conduct a hearing with Trevino regarding her failure to "outbound"[3] a trailer on November 20, 2007. (Def. App. p. 2).  Because Trevino had previously been issued a Warning Letter in September for failure to report to work at the designated time, Weigant testified he was instructed to meet with Trevino regarding the incident of November 20, and issue a notice of intent to suspend pursuant to

---

[3]"Outbound" is a UPS term for the procedure used to verify which trailer a driver was taking from the package center, so that other personnel could update the tracking system for the packages onboard.

the collective bargaining agreement.  (*Id*.).  Trevino testified that the supervisor who initially spoke with her about her failure to outbound also told her that she had used all of her FMLA allotment and could not take any additional FMLA days.  (Def. App. p. 124).

Weigant contends that "for several days" he left instructions with the employees at the dispatch office, where feeder drivers begin and finish their work days, for Trevino to come to Wiegant's office for a hearing.  (*Id*.; Pl. App. p. 69).  He testified that Trevino ignored those instructions, and that on December 3, 2007 he approached her in the dispatch office to initiate the hearing.  *Id*; (Def. App. p. 178).  Weigant testified that despite several requests, Trevino refused to come to the meeting.  (*Id*.).  Weigant then left the room and asked a union steward to instruct Trevino to come to Weigant's office for a hearing.  Trevino denies refusing to follow Weigant's instructions, and testified that when Weigant left the room, she began having a panic attack.  (Pl. App.. p. 13).  When Weigant returned to the dispatch office to ask if Trevino was coming to the hearing, Trevino informed him she was having a panic attack.  Trevino then locked herself in the bathroom, where her symptoms worsened, and she called 911.  Other members of the UPS management arrived, and Weigant left to meet the ambulance at the gate.  Trevino left the UPS facility in an ambulance.  (Def. App. p. 28; Pl. App. p. 71).

Following the incident, Division Manager Mark Lopes conferred with Labor Relations Manager Sue Dunphy and Transportation Service Manager Ben Mezechenko and decided to terminate Trevino on the stated grounds of "gross insubordination."  (Def. App. p. 177, 186).  Mr. Lopes signed Trevino's termination letter, dated December 13, 2007.  (Def. App. p. 238).

Trevino filed a grievance over the termination and, following a deadlock by the UPS-Teamsters Union Deadlock Committee, UPS and the Union settled the grievance.  Trevino was

reinstated with full back pay and benefits and returned to her position as a feeder driver at the Mesquite hub. (Def. App. p. 186). Prior to resuming her driving duties, UPS required Trevino to complete a training course in the Mesquite hub facility, and drive under observation. Trevino alleges that she was told that her first day back would include an eight hour training at the UPS office. (doc. 64 p. 12). However, upon her return to work, Trevino presented a note from her doctor stating that Trevino was cleared to work half time (four hours per day) on her first two days back with UPS, and could thereafter work full time. (Def. App. p. 239). UPS argues that it complied with the doctor's restrictions, because it only required Trevino to remain in the office for an hour and a half, with the balance of her time spent on the road. (doc. 58 p. 12). Trevino counters that UPS did not inform her that her training would be split between the office and the road until she reported to work, after she had requested the accommodation of half-time and was denied. (doc. 68 p. 13). Trevino subsequently resumed her duties as a feeder driver.

The next action Tevino describes in support of her claims of discrimination and harassment occurred on July 22, 2008, when UPS pulled Trevino out of service for driving "while seriously ill or under the influence." (doc. 58 p. 12). The parties agree that three UPS managers, including Muzechenko, intercepted Trevino on the road as she drover her feeder truck from Big Cabin, Oklahoma back to the Mesquite hub (a distance of approximately 300 miles), and took her out of service. (doc. 58 p. 12-13; doc. 68 p. 8). Upon her return to Mesquite, the UPS managers accompanied Trevino to the hospital for evaluation and a fitness for duty test. (*Id.*). At the hospital, Trevino was sedated and examined, and given a brethalyzer test. (*Id.*). UPS contends that it removed Trevino from service because of safety concerns after receiving a report from another feeder

driver, John Fichera,[4] who saw Trevino at Big Cabin "noticeably distressed, disoriented, and gasping for air." (Def. App. p. 177). UPS asserts that when Fichera approached Trevino, Trevino asked him not to call her management because she feared she would be taken out of service. (doc. 58 p. 12).

Trevino contends that she was not ill or impaired when she left Big Cabin and that UPS's actions were unjustified and discriminatory. (doc. 64 p. 10). Trevino testified that while she "was having trouble breathing a little bit," when approached by Fichera, but that she assured him she was "okay to drive back." (Def App. p. 60). Trevino argues that UPS presented no evidence to indicate that Fichera's report was reliable or why it credited his report over her assurances that she was not ill or impaired. (doc. 64 p. 10). She also testified that Muzechenko, after stopping her on the road, asked her why she did not take an FMLA day instead of driving "when you take them all the time." (*Id.* at 9). Trevino contends that UPS's actions were not based on a reasonable concern for safety, but instead taken as a result of her medical conditions following a request for FMLA leave. (*Id.*).

Following the incident, Division Manager Mark Lopes conferred with Labor Relations Manager Sue Dunphy and Transportation Service Manager Ben Mezechenko and decided to terminate Trevino for violation of Department of Transportation Regulation 392.3. (Def. App. p. 226). Lopes testified that he believed Trevino's driving on July 22 violated the regulation, that states "no driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is impaired . . . through fatigue, illness, or any other cause." (*Id.*). Lopes signed an intent to terminate on August

---

[4]Mezechenko testified Fichera, a feeder driver in the UPS's Dallas facility, observed Trevino's condition at Big Cabin. Fichera contacted Dallas dispatch, and Dallas Feeder Dispatch Manager Wayne Williams then contacted Mezechenko at the Mesquite dispatch. Mezechenko and two other managers from the Mesquite hub then left to intercept Trevino. (Def. App. P. 176-77).

5, 2008.

Trevino grieved the intent to terminate and it was subsequently reduced to a warning letter. (Def. App. p. 186). Before allowing Trevino to return to driving duty, UPS required her to receive a medical release from its designated health provider, Concentra. Trevino contends that Concentra delayed approval for approximately one month, and that while awaiting Concentra's approval she worked in a warehouse for ten hours per day handling bags of packages. (doc. 64 p. 7). UPS contends that it followed its procedure in requiring a medical release, and noted that Trevino received the same pay and benefits while working in the warehouse. (Def. App. p. 186). Trevino believes that the assignment constituted harassment and retaliation, in part because of the physical demands of the job during the height of the Texas summer. (Def App. p. 177-187). The parties agree that Trevino was reinstated to her position as a feeder driver on August 28, 2008 and that she continues to hold that position today.

On May 28, 2008, Trevino filed this suit against UPS and Weigant, asserting claims for discrimination, harassment, and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), discrimination, harassment, and retaliation under the Americans with Disabilities Act ("ADA"), retaliation under the FMLA, and intentional infliction of emotional distress ("IIED"). (doc 1). The parties stipulated to the dismissal with prejudice of Trevino's claims for IIED and her claims against Weigant under Title VII and the ADA. (doc. 52). The Court granted Defendant Weigant's motion for summary judgment (doc. 82), and now considers the motion of Defendant UPS. (doc. 57).

## II.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(c); *Little v. Liquid Air Corp.*, 37 F.3d 1069 1075 (5th Cir. 1994). Only disputes about material facts preclude a grant of summary judgment, and "the substantive law will identify which facts are material." *Anderson v. Liberty Lobby*, 477 U.S. 242,248 (1986).

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). Where the non-movant bears the burden of proof at trial, the movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support an essential element of the non-movant's case. *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. V. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,'" . . . by 'conclusory allegations,'" . . .by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). The non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). The Court will not make

-11-

credibility determinations, weigh the evidence, or draw inferences but instead confine its inquiry to facts material under the governing legal standard. *Anderson*, 477 U.S. at 255. In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to Trevino, the non-movant. *Id.* at 301.

## III.

## ANALYSIS

A.    *Trevino's ADA Claims*

Trevino contends that the events described above taken together constitute discrimination, harassment, and failure to accommodate in violation of the ADA. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 474 (5th Cir. 2006). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless . . . the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A).

The *McDonnell Douglas* burden-shifting analysis applies to claims brought under the ADA based on circumstantial evidence. *McInnis v. Alamo Community College Dist.*, 207 F.3d 276, 279 (5th Cir. 2000). Under this framework, Trevino first bears the burden of making a *prima facie* case of discrimination. If Trevino establishes a *prima facie* case, "the burden then shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the action." *Id.* "Once the

employer articulates such a reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination. *Id*. at 280.

       i.    <u>Trevino's *Prima Facie* Case Under the ADA</u>.

To establish a *prima facie* case of discrimination under the ADA, Trevino must present evidence that "(1) [she] is disabled; (2) with reasonable accommodations, [she] is qualified for the position; and (3) [she] suffered an adverse employment decision based on her disability." *Dillon v. Roadway Express*, No 04-60785, 2005 WL 994915 (Apr. 29, 2005) (citing *Still v. Freeport-McMoran, Inc.*, 120 F.3d 50, 51-52 (5th Cir. 1997)). The first and most significant issue UPS raises is whether Trevino is disabled for the purposes of the ADA; this issue is fundamental to her claims for discrimination, harassment, and failure to accommodate. Because Trevino has presented evidence that would permit a reasonable jury to conclude she is disabled, summary judgment on this ground is not appropriate.

"As a threshold requirement in an ADA claim, the plaintiff must, of course, establish that [she] has a disability." *Waldrip v. Gen'l Elec. Co.*, 325 F.3d 652, 654 (5th Cir. 2003). UPS argues that the record evidence cannot establish that Trevino is disabled for the purposes of the ADA. (doc. 58 p. 15). The ADA defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 563 (1999) (quoting 42 U.S.C. § 12102(2)). Application of this statutory definition is a three part test: first the court considers whether Trevino has an "impairment," next the court considers whether the activity on which Trevino relies is a "major life activity," and if so, whether

the impairment "substantially limits" that major life activity. *Waldrip*, 325 F.3d at 654.

The parties do not dispute that Trevino's depression, PTSD, and panic disorder constitute mental impairments, but differ over whether those impairments substantially limit any major life activity. (doc. 58 p. 15). Trevino contends that she has produced evidence to establish both a "record of disability" and that UPS "regarded her as" disabled. (doc. 64 p. 6-8). UPS correctly notes that evidence of diagnosis alone will not establish disability. (doc. 74 p. 3). The Supreme Court held that "[m]erely having an impairment does not make one disabled for purposes of the [Act]. Claimants also need to demonstrate that the impairment limits a major life activity." *Toyota Motor Mfg. Ky., Inc. v. Williams*, 534 U.S. 184, 185 (2002). The court is obligated to "determine the existence of disabilities on a case-by-case basis." *Albertson's*, 527 U.S. at 566. *See also* 29 C.F.R. pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). At the summary judgment stage, the Court will consider whether the evidence presented would permit a reasonable jury to conclude that Trevino was substantially limited in a major life activity. *Desmond v. Mukasey*, 530 F.3d 944, 957 (D.C. Cir. 2008).

Here, Trevino contends that she is substantially limited in "the major life activities of sleeping, bathing, caring for herself, working, and memory." (doc. 64 p. 3). In considering whether an activity qualifies as a major life activity, the Supreme Court instructs that "the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998). The Court finds that these functions constitute major life activities and Trevino may present evidence that they are significantly impaired. First, "[e]very circuit that has

-14-

addressed the issue has concluded that sleeping is a major life activity."  *EEOC v. Chevron Phillips*

*Chem. Co., LP*, 570 F.3d 606, 616 (5th Cir. 2009); *see also Desmond*, 530 F.3d at 953 (finding that

sleep is central to the life process and properly considered a major life activity under the ADA).

Further, the "ADA's implementing regulations as promulgated by the EEOC specify that caring for

oneself is a major life activity." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 616 (5th Cir.

2009) (citing 29 C.F.R. § 1630.2(i))[5]; *Hamilton v. SW Bell Tel. Co.*, 136 F.3d 1047, 1050 (5th Cir.

1998).  The Fifth Circuit has also held that the sort of memory and focus problems that Trevino

describes may raise a fact issue regarding the substantial impairment of the major life activity of

thinking.  *Chevron Phillips*, 570 F.3d at 616.

UPS argues that Trevino has not, as a matter of law, presented sufficient evidence that she

is "substantially limited" in any major life activity as required to support a *prima facie* case.  (doc. 58

p. 15-18).  UPS cites to cases where the burden was not met.  (*Id.*).  The EEOC advises that in

determining whether an individual is substantially limited in a major life activity, the Court should

consider "(i) the nature and severity of the impairment, (ii) the duration or expected duration of the

impairment, and (iii) the permanent or long term impact of or resulting from the impairment."

*Chevron Phillips*, 570 F.3d at 615 (quoting 29 C.F.R. § 1630.2(i)).  The analysis requires a

"particularized inquiry" and must rest upon more than generalized allegations.  *Waldrip, 325 F.3d at*

*656.* "[B]ecause the determination of whether an impairment substantially limits a major life activity

within the meaning of the ADA is fact-specific, a court of appeals' decision that a particular

employee's [impairment] did not present a prima facie case of a substantial limitation on her ability

---

[5]  29 C.F.R. § 1630.2(I) provides: "Major Life Activities means functions such as caring for
oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."

to care for herself did not mean that [that impairment] could never impose a limitation under the specific facts of other cases." *Chevron Phillips*, 570 F.3d at 619 (citing *Ryan v. Grae & Rybicki*, 135 F.3d 867, 871-72 (2d Cir. 1998)).   Trevino testified that her PTSD and depression have: confined her to her home for periods of weeks (Pl. App. p. 48-40), prevented her from bathing for a periods of up to a week (Pl. App p. 51), and regularly caused her to go days without sleeping (Pl. App. p. 56). This testimony sufficiently describes her limitations in terms of her own experience.   Trevino supports her testimony with the notations and correspondence of her treating physicians and the documentation submitted to establish her eligibility under the FMLA on account of her conditions.

UPS argues that Trevino's impairments do not substantially limit her activities, and contends that her symptoms are episodic, leading only to temporary or sporadic impairment.   (doc. 58 p. 16-17; doc. 74 p. 3-5).   UPS correctly notes that to constitute a substantial limitation, Trevino's impairments must be permanent or long term. *Wilborn*, 2005 WL 701045 at *3.   The Fifth Circuit noted that [e]xamples of temporary, non-disabling impairments include: 'broken limbs, sprained joints, concussions, appendicitis, and influenza.'" *Chevron Phillips*, 570 F.3d at 619 (quoting 29 C.F.R. § 1630.2(j)).   However, the episodic nature of Trevino's impairments is not fatal to her claim.   While "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities," Trevino has presented evidence that she suffers from chronic conditions with symptoms of indefinite duration.   *Chevron Phillips*, 570 F.3d at 619.   In *Chevron Phillips*, the Fifth Circuit recognized that "relapsing-remitting conditions . . . can constitute ADA disabilities depending on the nature of each individual case." 570 F.3d at 618.[6]   Trevino's Response

---

[6] In 2008, Congress amended the ADA, effective January 1, 2009 in part to clarify that [a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity

cites to evidence showing that she has chronic conditions that intermittently present symptoms which a jury could find to be substantial impairments of major life activities. Trevino's depression and PTSD, like the disability alleged in *Chevron Phillips*, "is thus much more akin to conditions like epilepsy and MS than [they are] to a broken leg or the flu." 570 F.3d at 619. Accordingly, in weighing the evidence, a jury may permissibly conclude that Trevino has shown a record of disability under the ADA.[7] Of course, the jury may not so conclude, but the record precludes summary judgment on this issue. *See Desmond*, 530 F.3d at 957.

UPS also contends that Trevino's *prima facie* case fails because she has been reinstated following her successful grievances and "continues to work for UPS as a feeder driver" with the same compensation and benefits. (doc. 58 p. 14). Trevino's subsequent reinstatement does not preclude her ability to establish that her terminations and suspensions constituted adverse employment actions

---

when active." 42 U.S.C. § 12102(4)(D). The Fifth Circuit found that the amendment does not apply retroactively. *EEOC v. Agro Distrib., LLC*, 555 F.3d 462 (5th Cir. 2009). Other courts have applied the provision to acts occurring prior to the effective date. *Menchaca v. Maricop Comm. College Dist.*, 595 F.Supp.2d 1063, 1070 (D. Ariz. 2009). The Court need not rely upon the Amendment, as authority under the pre-Amendment ADA permits a plaintiff to make a *prima facie* case with evidence of significant impairment that is episodic in nature.

[7] Trevino argues both that she established a record of disability and alternatively that she was "regarded as" disabled. The Court finds that a fact issue exists only as to Trevino's record of disability. UPS correctly argues that the evidence presented is not sufficient as a matter of law to show that UPS regarded Trevino as disabled. To survive summary judgment on a "regarded as" claim, "en employee must show that an employer regarded the employee as substantially limited in his ability to work by finding that the employee's impairment forecloses his ability to perform a class of jobs or a broad range of jobs." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 287 (5th Cir. 2004). The "inability to perform a single, particular job does not consitute a substantial limitation in the major life activity of working." *Pryor v. Trane*, 138 F.3d 1024, 1027 (5th Cir. 1998). Accordingly, Trevino's evidence that some at UPS considered her "too ill to drive" does not create a fact issue. Trevino does not deny that even when UPS allegedly regarded Trevino as too ill to drive, it employed her in a non-driving capacity. Because Trevino has presented evidence sufficient to survive summary judgment on the grounds that she had a record of disability, her failure to create a fact issue under the regarded as prong is not fatal to her *prima facie* case.

at the time they were taken.  *See  Abugalyon v. City of El Paso*, 2005 WL 1884804 (W.D. Tex. Aug.

5, 2005) at *6 (limitations period begins running upon the occurrence of the employment action and

is not tolled during internal grievance process).  Because Trevino has identified material facts

relevant to the disputed elements of her *prima facie* case, summary judgment is improper on this

ground.

ii.  <u>UPS's Articulated Non-Discriminatory Reasons and Trevino's Argument of Pretext</u>.

Once Trevino makes her *prima facie* showing, "the burden shifts to the defendant-employer

to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *McInnis*,

207 F.3d at 276.  UPS's burden is one of production; "[i]f the employer produces any evidence

'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the

adverse action,' then the employer has satisfied its burden."  *Daigle v. Liberty life Ins. Co.*, 70 F.3d

394, 396 (5th Cir. 1995) (citing *St. Mary's Honor Center v. Hicks*, 409 U.S. 502, 507 (1993)).  In

determining whether this burden is satisfied, the Court's analysis "can involve no credibility

assessment."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).  For each of the

adverse employment actions that are potentially actionable discrimination under the ADA,[8] UPS

has articulated a nondiscriminatory reason, supported by some evidence.  (doc. 58 p. 11-13; Def.

App. P. 225-226).  UPS Division Manager Mark Lopes argues that he terminated Trevino in

December 2007 after concluding her behavior vis-a-vis On-Road Supervisor Ronnie Weigant was

grossly insubordinate.  (*Id.*).  He asserts that issued an intent to terminate Trevino in August 2008

---

[8]  The Court will evaluate the denial or delay in approval of Trevino's FMLA requests when considering her claim for failure to accommodate and for FMLA retaliation.

because he believed she drove her feeder truck while impaired in violation of DOT regulations. (*Id.*). The Court finds that UPS has met its burden to articulate a legitimate, nondiscriminatory reason for these adverse employment actions.

Once the employer meets its burden of production, "the shifting burden scheme is abandoned and becomes irrelevant. The employer's intent is a question of fact, for which the plaintiff carries the burden of persuasion." *Daigle*, 70 F.3d at 394. Trevino then has the opportunity to demonstrate that UPS's proffered reasons are false and pretext for discrimination. *Hicks*, 509 U.S. at 515-16. "A jury issue will be presented and a plaintiff can avoid summary judgment if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that the plaintiff's disability was a determinative factor in the actions of which plaintiff complains." *Donahue v. Melrose Hotel*, No. 3:95-CV-2630-R, 1997 WL 148012 at *8 (N.D. Tex. March 26, 1997). This burden is met where the plaintiff shows "that the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143. The Court may consider evidence put forward as part of the *prima facie* case as well as any additional evidence of pretext. *Id.*

Trevino contends that the UPS's proffered reasons are pretext for discrimination largely because she believes UPS's employment decisions were not based upon a correct understanding of the underlying conduct. Trevino does not present evidence that Lopes's stated reason for her December 2007 termination, gross insubordination, was pretextual.[9] (doc. 64 p. 9). Viewed in the

_____

[9] Instead, her response focuses on the alleged denial of FMLA following the November 2007 incident for which she was to receive discipline at a hearing in December 2007. *Id.* The adverse employment action for purposes of Trevino's ADA discrimination claim, however, remains the termination in December. Trevino's burden is to show that UPS's proffered reason – insubordination in December 2007 – is pretext for unlawful discrimination.

light most favorable to Trevino, a jury could conclude that Lopes's decision was in error, because, if Trevino was instructed that she would not be required to have contact with On-Road Supervisor Weigant (who attempted to hold the disciplinary hearing in December), then her failure to speak with him could not reasonably be viewed as insubordination.   The Fifth Circuit has instructed, however, that "[t]he question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).   Similarly, Trevino's arguments related to the 2008 intent to terminate for driving while ill show at most error.   Trevino does not deny that UPS management received a phone call from another driver who was concerned about Trevino's condition, but argues that UPS presented no evidence that this driver's report were reliable.   (doc. 64 p. 10).   To meet her burden, Trevino must do more than question the reliability of UPS's information or the reasonableness of its actions in response, she must present substantial evidence that UPS's proffered reason is pretext for discrimination.   *Donahue*, 1997 WL 148012 at *8 ("if the evidence put forth by the plaintiff to establish the prima facie case and to rebut the employer's reasons is not substantial, a jury cannot reasonably infer discriminatory intent, and summary judgment is appropriate.").   Accordingly, the Court GRANTS UPS's motion for summary judgment on Trevino's claim for discrimination under the ADA.

iii.   <u>Trevino's Claim for Disability Harassment</u>.

UPS also moves for summary judgment on Trevino's ADA claim for hostile working environment on the grounds that Trevino is not disabled within the meaning of the ADA and because the work environment was not hostile.   (doc. 58 p. 22).   Because the Court concluded that fact issues preclude a finding that Trevino is not disabled, the Court turns now to the question of

whether the evidence presented creates a fact issue regarding harassment.

To succeed on a claim for disability-based harassment under the ADA, Trevino must demonstrate: "(1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 508 (5th Cir. 2003) (citing *Flowers v. S. Reg'l Physician Servs. Inc.,* 248 F.3d 229, 235-36 (5th Cir. 2001)).   The standard for disability harassment in the Fifth circuit is high: "disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment."   *Id* (quoting *Flowers*, 247 F.3d at 236).   "In deciding whether a working environment is abusive, a court must consider evidence in its entirety, 'including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'"   *Ballard v. Healthsouth Corp.*, 147 F.Supp.2d 529, 536 (N.D. Tex. 2001) (quoting *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).   The Court concludes that Trevino has not met this burden.

While a discrimination claim is based on discrete acts of discrimination, a harassment or hostile work environment claim alleges an unlawful practice comprised of acts that may not themselves be actionable.   *Nat. R.R. Passenger Corp. V. Morgan*, 536 U.S. 101, 117 (2002).   In addition to the termination and intent to terminate discussed above, Trevino points to offensive comments, the forced fitness-for-duty exam and the conduct of UPS management during and leading up to the exam, and several actions related to Trevino's return to work.   (doc. 64 p. 11-14).   Turning

first to the offensive comments, Trevino presented evidence that a co-worker in 2003 asked whether she had "taken her medicine." (Def. App. p. 90-91). Trevino also alleges that when Muzechenko first spoke with her on July 22, 2009 after stopping her on the road, asked her why she did not take an FMLA day instead of driving "when you take them all the time." (doc 64 p. 9). Trevino does not allege that similar comments occur with regularity, and the Court finds that these instances are not sufficiently severe and pervasive to rise to constitute actionable harassment. *Compare Gowesky*, 321 F.3d at 506 (several comments regarding plaintiff's hepatitis were insufficient) *with EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 400 (5th Cir. 2007) (evidence showed, among other instances, plaintiff was "subjected to verbal harassment on a regular basis for a period of approximately one year").

Trevino also argues that the conduct of UPS supervisors on July 22, 2008 contributed to a hostile working environment.  (doc. 64 p 12).  She argues that the forced fitness for duty examination was"physically humiliating" and, taken together with the circumstances of her removal from the road, the experience was sufficiently severe to support a claim for harassment. (*Id.*). The Court disagrees.  While the fitness for duty test was surely unwelcome, Trevino has not presented evidence that the examination was conducted unprofessionally, was accompanied by degrading or abusive behavior, or that it was not conducted in accordance with the hospital's usual procedures. Trevino also contends that the return-to-work requirements -- which included medical certification, off-road work in the interim, and required training – contributed to a hostile work environment. Though these return-to-work requirements could have been completed more efficiently or communicated more clearly, Trevino has not produced evidence that they were sufficiently severe to support a claim of harassment. *See Gowesky*, 321 F.3d at 510 ("Moreover, even if these conditions were 'unreasonable,' it is unclear that an 'unreasonable return-to-work condition could raise a

genuine material fact issue concerning 'harassment.' [Plaintiff] has failed to present any authority, and we have located none, for the proposition that an unreasonable condition alone constitutes 'harassment' under the ADA or its model, Title VII.").  Aside from the difficulties that necessarily attend a fitness-for-duty examination and later return-to-work conditions, Trevino has not presented evidence that UPS took any action to embarrass or humiliate her, or to cause any additional harm.

Because Trevino has not presented evidence raising a genuine issue of material fact regarding harassment or hostile working environment, the Court GRANTS UPS's motion on this claim.

 iv      <u>Trevino's Failure to Accommodate Claim</u>.

Trevino's failure to accommodate claim is grounded in the assertion that "[o]n numerous occasions, UPS has denied or delayed approving Plaintiff's requests for FMLA leave." (doc 64 p. 14). UPS argues that it never denied Trevino requested FMLA leave and did not deny any other requested accommodation.  (doc. 58 p. 25).

Trevino correctly notes that "[a]n employer . . . may, in appropriate circumstances, have to consider the provision of leave to an employee as a reasonable accommodation. . ." (doc. 64 p. 14) (quoting *EEOC v. Chemtech Int'l Corp.*, 1994 U.S. Dist. LEXIS 21878, at *8 n.6 (S.D. Tex. July 21, 1995)).  Trevino does not point to any requests for accommodation -- such as modified work schedules or requests for time off under company policies -- other than requests for leave under the FMLA.[10]  The Court will not consider Trevino's allegations related to FMLA leave as cognizable under an ADA claim for failure to accommodate.  FMLA leave is not a reasonable accommodation

---

[10]  The only other potential request for accommodation is the doctor's note Trevino presented upon her return to driving duty following her removal in July, 2008.  UPS argued that it complied with the doctor's requested restrictions and Trevino does not deny UPS complied.  Rather, Trevino argued that, though UPS eventually complied, it did not inform her initially that it would do so.   (doc. 64 p. 13).

under the ADA; rather, it is a right enforceable under a separate statutory provision. "The ADA and the FMLA have divergent aims, operate in different ways, and offer disparate relief." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 101 (1st Cir. 2001); *see also Vice v. Blue Cross & Blue Shield of Oklahoma*, 113 Fed. App. 854, 857 (10th Cir. 2004) (noting the differences between the "ADA's accommodation obligation" and the "FMLA's leave entitlement").

Because Trevino has not presented evidence that UPS denied any accommodation request or that refused to engage in good faith negotiations related to accommodation of her disabilities, the Court GRANTS UPS's motion on Trevino's failure to accommodate claim.[11]

B.      *Trevino's Title VII Claims*

Trevino also brings claims for sex discrimination, sex harassment, and retaliation in violation of Title VII. (doc. 42 p. 6-7). Except where noted below, Trevino's discrimination and harassment claims depend on the same facts alleged and discussed in Part III A of this Order.

    i.      <u>Sex Discrimination, Harassment, and Retaliation</u>.

The *McDonnell Douglas* framework discussed above allocates the burdens between the parties in sex discrimination claims brought under Title VII. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2005). To establish a *prima facie* case of discrimination, Trevino must show: "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated." *Id.* (quoting *Rutherford v. Harris Co., Tex.*, 197 F.3d 173, 184 (5th Cir. 1999)). The parties do not dispute that Trevino is a member of a protected class or that she was qualified for her position. For the reasons

---

[11]   Because Trevino has not presented evidence of any failure to accommodate, the Court need not consider whether the claim, if supported by evidence, would have been included within the scope of her EEOC complaint.

discussed Part III A(i) of this Order, the Court finds that the terminations forming the basis of Trevino's Title VII claims constitute adverse employment actions.

The parties vigorously dispute whether Trevino has presented facts sufficient to show that others "similarly situated" were more favorably treated. "To establish disparate treatment, a plaintiff must demonstrate that a 'similarly situated' employee under 'nearly identical' circumstances was treated differently." *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 406 (5th Cir. 2005) (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995)). To be similarly situated, Trevino must demonstrate "that the misconduct for which she was discharged was nearly identical to that engaged in by an employee not within her protected class whom the company retained." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001).

Trevino argues that a male feeder driver – who operated his truck while injured without removal from service or other discipline – was treated more favorably than she was in July 2008. (doc. 64 p. 16). She testified that the male feeder driver, who was later determined to have broken his wrist, was nevertheless allowed to drive his truck from Houston to the Mesquite hub. According to Trevino, the male driver injured himself in Houston, called UPS dispatch in Mesquite to report his injury, and was permitted to drive back. In contrast, she argues that when informed of her potential impairment, UPS sent management personnel to intercept her on the road and remove her from service. (*Id*.). UPS argues that the male driver was not similarly situated because its management did not believe he was driving while impaired. (doc. 58 p. 20). UPS points to evidence that the male driver, Keith Caruthers, reported his injury to the Mesquite hub and was "instructed to speak with UPS managers on site in Houston to verify that he could safely drive back to Mesquite." (Def. App. p. 178). UPS also argues that managers in Houston "spoke with Mr.

Caruthers and looked at his wrist and determined that he was able to safely return to Mesquite," and that it was only days later that UPS learned that his wrist was broken. (*Id.*). Trevino does not contest UPS's description of the event, but argues that UPS handled her situation differently because it did not take any action to validate the "rumors" that she was "distressed, disoriented, and gasping for air." (doc. 64 p. 16).

The Court finds that the evidence Trevino presented does not establish that Caruthers's situation involved "nearly identical circumstances" as required under the demanding Fifth Circuit rule. Only where a supervisor treats an employee less favorably "under circumstances that are *essentially identical*" does a presumption of discrimination arise. *Wallace*, 271 F.3d at 221. In contrast, "the conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Id.* (citing *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304-05 (5th Cir. 2000)). Here, UPS presented uncontested evidence that once it learned of Caruthers's injury, it allowed him to drive only after its managers in Houston evaluated his injury. That significant difference in circumstances defeats Trevino's *prima facie* case, though in retrospect, the Houston management underestimated the severity of Caruthers's injury. Further, Trevino has not, as discussed in Part III A of this Order, presented evidence to show that the July 2008 removal and subsequent termination was pretext for unlawful discrimination.

Trevino additionally alleges that other conduct discussed in Part III A of this Order constitutes discrimination and harassment based on sex. For the reasons described therein, the Court GRANTS UPS's motion for summary judgment on Trevino's sex discrimination and harassment claims.

The only adverse employment action not previously discussed that Trevino points to in support of her Title VII retaliation claim – a termination in December 2005 that closely followed a charge of sex harassment – is time barred and may not be considered. "A civil action under Title VII must be brought within ninety days of receipt of a right-to-sue letter from the EEOC." *Berry v. CIGNA / RSI-CIGNA,* 935 F.2d 1188, 1191 (5th Cir. 1992) (citing 42 U.S.C. § 2000e 5(f)). Trevino filed a Charge of Discrimination regarding the 2005 termination for which she received a right-to-sue letter in December 2006. Because Trevino may not, in a lawsuit filed in May 2008, assert a retaliation claim based on her 2005 termination, her remaining claim for retaliation must fail. Accordingly, the Court GRANTS UPS's motion for summary judgment on Trevino's Title VII retaliation claim.

C       *Trevino's FMLA Claims*

Trevino alleges that UPS took a number of actions that constitute discrimination and retaliation on account of her "exercising her rights under" the FMLA. (doc. 41 p. 10-11). The FMLA allows eligible employees working for covered employers to take a reasonable leave of absence for certain enumerated reasons, including medical reasons, without fear fo losing their jobs as a result. 29 U.S.C. § 2601 (b); *Hunt v. Rapides Healthcare Sys., LLC,* 277 F.3d 757, 763 (5th Cir. 2001). The Fifth Circuit has explained that the statute contains both prescriptive and proscriptive components. *See Nero v. Indus. Molding Corp.,* 167 F.3d 921, 927 (5th Cir. 1999). The prescriptive provision "creates a series of substantive rights or entitlements," including, for example, the right to up to 12 weeks of unpaid leave and the right to "return to the same period after a qualified absence." *Mauder v. Metro. Transit Auth.,* 446 F.3d 574, 580 (5th Cir. 2006). The proscriptive aspect of the FMLA protects employees from retaliation or discrimination for exercising their rights under the statute.

-27-

*Nero*, 167 F.3d at 927.  Trevino's claims allege violations of the later provision; she contends both that some leave requests were either delayed or denied discriminatorily and that UPS retaliated against her for exercising her protected rights.

Absent direct evidence of discriminatory intent, the Fifth Circuit applies the "familiar *McDonnell-Douglas* burden shifting framework" to claims of retaliation under the FMLA.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332 (5th Cir. 2005); *Powers v. Woodlands Religious Community, Inc.*, 323 Fed. Appx. 300, 302 (5th Cir. 2009) ("Because [Plaintiff] produced only circumstantial evidence of discrimination, the burden-shifting analysis set forth in *McDonnell Douglas Corp v. Green* guides our inquiry.").  Under this framework, the employee, Trevino, must first meet her burden of establishing a *prima facie* case of retaliation.  *Richardson*, 434 F.3d at 332.  If Trevino succeeds in making a *prima facie* case, the burden shifts to UPS to "articulate a legitimate, nondiscriminatory or non-retaliatory reason" for his action.  *Hunt*, 277 F.3d at 768.  If UPS does so, Trevino must produce evidence sufficient to support a finding by the preponderance of the evidence, that UPS's reason is a pretext for retaliation.  *Id.*; *Auguster v. Vermillion Parish School Bd.*, 249 F.3d 400, 403 (5th Cir. 2001).

       i.      <u>Trevino's Prima Facie Case</u>.

To make a *prima facie* case of retaliation under the FMLA, Trevino must present evidence that: "(1) she was protected under the FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave."  *Hunt*, 277 F.3d at 768.

The parties do not contest that Trevino is protected under the FMLA. In support of the third element, Trevino has alleged a series of facts that she contends support her claims for FMLA retaliation. First, she argues that her application for FMLA leave on July 4, 2006 was discriminatorily delayed by nearly two months. (Def. App. p. 74). She also testified that after she was stopped for failure to outbound in November 2007, a UPS manager informed her that she had "run out of FMLA days" and that Thelma Lee had told him that Trevino was no longer covered by the FMLA. *Id.* at 123-25. Next, Trevino points to the December 3, 2007 incident which led to her termination on the grounds of "gross insubordination." (doc. 64 p. 20-21). She argues that her failure to follow directions was the result of a panic attack and not insubordination. *Id.* Finally, she claims that her removal from service on July 22, 2008 closely followed her application for FMLA leave, and taken together with Mezechenko's comments regarding her use of FMLA leave, her discipline was causally linked to her exercise of rights under the FMLA. *Id.*

The Court finds that Trevino has presented evidence sufficient to withstand summary judgment on her *prima facie* case. In "evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the "temporal proximity" between the FMLA leave, and the [action]." *Mauder*, 446 F.3d at 583 (citing *Hunt*, 277 F.3d at 768). To survive summary judgment on the *prima facie* case, Trevino is not required "to show that the protected activity is the only cause" of the adverse employment action. *Id.* Rather, she is "required to show that the protected activity and the adverse employment action[s] [are] not completely unrelated." *Id.* (citing *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001)). The initial burden of the *prima facie* case is "not an onerous one," and Trevino has presented evidence sufficient

-29-

to shift the burden to UPS to articulate legitimate, non-discriminatory or non-retaliatory reasons for its decisions. *Tapia v. Michaels Stores, Inc.*, 553 F.Supp.2d 708, 713-14 (W.D. Tex. 2008) (citing *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

ii.    <u>UPS's Articulated Non-Discriminatory Reasons and Trevino's Argument of Pretext</u>

Once Trevino makes her *prima facie* showing, "the burden shifts to the defendant-employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *McInnis*, 207 F.3d at 276. UPS's burden is one of production; "[i]f the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden." *Daigle v. Liberty life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995) (citing *St. Mary's Honor Center v. Hicks*, 409 U.S. 502, 507 (1993)). For the reasons discussed in Part III A(ii) of this Order, the Court finds that UPS has articulated legitimate, nondiscriminatory reasons, supported by some evidence, for both the December 2007 termination and the August 2008 intent to terminate. Additionally, UPS argues that the delay in approving Trevino's July 2006 FMLA request resulted from the injury and unplanned absence of Thelma Lee, the UPS manager with approval authority for FMLA leave. (Def. App. P. 207-209; 211-212). The Court finds that UPS has met its burden to proffer legitimate reasons for its actions, and the burden shifts back to Trevino to show that those reasons are pretext for unlawful discrimination or retaliation.

The standard for showing pretext is described in Part III A(ii) of this Order. The Court may consider evidence put forward as part of the *prima facie* case as well as any additional evidence of

-30-

pretext that Plaintiff offers. *Reeves*, 530 U.S. at 143. The Court finds that Trevino has identified evidence sufficient to create a genuine issue of fact that UPS's articulated reasons were pretextual. In contrast with her ADA or Title VII claims, Trevino has presented evidence that the adverse actions closely followed her invocation of FMLA rights, that the events were related to Trevino's need for FMLA leave, and that several UPS's actions were accompanied by comments on the topic. A reasonable jury, crediting Trevino's testimony and evidence, and drawing inferences in her favor, could permissibly conclude that UPS took adverse employment actions in retaliation for Trevino's repeated use of the FMLA. Trevino offered testimony, that if believed, could support the conclusion that the delay in approving her 2006 FMLA leave was meant to discourage her from making such requests. She points to evidence that UPS supervisors expressly mentioned her use of FMLA leave, both at the November 2007 incident that precipitated her December 2007 termination and at the July 22, 2008 incident that prompted the August intent to terminate. She also presented evidence that her conduct on December 3, 2007 was the result of a serious medical condition that would potentially entitle her to FMLA leave. Thus the Court finds that Trevino met her burden to produce sufficient evidence to carry the question of pretext to a jury, and DENIES UPS's motion for summary judgment on Trevino's FMLA claims.

D.      *Trevino's ERISA Claims*

Trevino brings ERISA claims alleging that UPS denied benefits under an ERISA plan, failed to adviser her of rights under ERISA, interfered with her rights under ERISA, and retaliated against her for exercising her ERISA rights. (doc. 41 p. 8-9). UPS moves for summary judgment on the grounds that it is not a proper defendant because Union, and not UPS, administers the plans in

question and because Trevino has not presented evidence required to establish her retaliation, interference or failure to advise claims. (doc. 58 p. 37-39).

The parties do not contest that the plans at issue, medical, 401(k), and pension plans, are covered by ERISA. (*Id.*; doc. 64 p. 21-22). Trevino alleges that after successfully grieving her December 2007 termination, she was reinstated "with the agreement that her benefits would be restored." (doc. 64 p. 21). She contends that her benefits were not timely restored, and that certain medical bills were only covered following a grievance with the Union. (*Id.*). She also claims that she was unable to participate in the pension or 401(k) plans for a period of time following her reinstatement. (*Id.*).

UPS first argues that it is not the proper party to any suit brought to recover benefits under an ERISA plan because it is not the administrator of the plans at issue and did not make any decisions related to her claims. (doc. 58 p. 37-38). UPS is correct regarding Trevino's claims for benefits allegedly denied. "29 U.S.C. § 1132(a) sets out the types of civil enforcement actions recognized under ERISA. . .When a participant wants what was supposed to have been distributed under a plan, the appropriate remedy is a claim for denial of benefits under § 1132(a)(1)(B) of ERISA. . ." *Lee v. Tyco Elecs. Power Sys, Inc.*, No. 3:04-CV-2260-D, 2006 WL 1722569 at *7 (N.D. Tex. June 20, 2006) Under that provision, courts in the Fifth Circuit have "consistently held that the only proper defendant in an ERISA enforcement action is the plan itself, regardless of control over the plan. *Johnson v. Hartford Life & Accident Ins. Co.*, No. H-09-57, 2009 WL 540959 at *3 (S.D. Tex. Mar. 4, 2009); *See also Lee*, 2006 WL 1722569 at *7 (noting that even in circuits "that have expanded the universe of proper defendants have included only parties that control the

administration of the plan."). Here, UPS introduced evidence that it does not administer the plans at issue and does not control their administration. Trevino admits the Union administers the plans at issue. (doc. 64 p. 22). Trevino has not presented evidence that anyone at UPS has authority over administration of the plans or the distribution of their benefits. Accordingly, the Court GRANTS UPS's motion for summary judgment on Trevino's claims based on denial of benefits under an ERISA plan.

Trevino also contends that UPS terminated her with the intent to interfere with her rights under an ERISA plan and in retaliation for exercising her rights under such plan. (doc. 41 p. 8). These claims are analyzed under the familiar burden-shifting framework; Trevino must first establish a *prima facie* case of interference or retaliation, UPS must then articulate legitimate reasons for its actions, which Trevino may then show to be pretextual. *Carlos v. White Consol. Indus., Inc.*, 934 F.Supp. 227, 232 (W.D. Tex. 1996). To establish a *prima facie* case, Trevino must present evidence that her "discharge was motivated by [her] employer's desire to retaliate against [her] for exercising such a right or with the attainment of benefits to which [she] might be entitled." *Id.* (citing *McGann v. H & H Music Co.*, 946 F.2d 401, 402 (5th Cir. 1991)). This requires her to show "that the loss of benefits was more than the incidental result of discharge." *Carlos*, 934 F.Supp. At 232 (citing *Seaman v. Arvida Realty Sales*, 985 F.2d 543 (11th Cir. 1993); *see also Stafford v. True Temper Sports*, 123 F.3d 291, 295 (5th Cir. 1997) (applying burden-shifting framework and requiring the loss of benefits to be "more than an incidental loss from discharge"). UPS argues that the record does not contain any evidence of an intention to interfere with ERISA benefits or to retaliate for use of such benefits. Trevino's response points only to her testimony that she is not sure if she had been properly

reimbursed following her reinstatement.  (doc. 64 p 22).  This testimony is not sufficient to present a fact issue on the question of UPS's intent.  Accordingly, the Court GRANTS UPS's motion for summary judgment on Trevino's claims for ERISA retaliation and interference.

Finally, Trevino contends that UPS failed "to advise her of rights under ERISA plans."  (doc. 41 p. 9).  UPS argues that Trevino has produced no evidence to identify which rights are at issue. (doc. 58 p. 38).  Trevino did not provide any evidence in response.  Because a non-movant may not meet her summary judgment burden with conclusory allegations or unsubstantiated assertions, summary judgment on this claim is appropriate.  *Little*, 37 F.3d at 1075.

## IV.

## CONCLUSION

For the reasons stated above, the Court: (1) GRANTS UPS's motion for summary judgment on Trevino's claims for discrimination, harassment, and failure to accommodate in violation of the ADA; (2) GRANTS UPS's motion for summary judgment on Trevino's claims for sex discrimination, sex harassment, and retaliation in violation of Title VII; (3) DENIES UPS's motion for summary judgment on Trevino's claim for retaliation under the FMLA; and (4) GRANTS UPS's motion for summary judgment on Trevino's ERISA claims.

SO ORDERED,   SIGNED: October 23, 2009

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE